Cite as 2020 Ark. App. 123

# ARKANSAS COURT OF APPEALS
DIVISION I
**No.** CR-19-505

| | |
|---|---|
| JEFFREY ALLEN LEWIS | **Opinion Delivered:** February 19, 2020 |
| APPELLANT | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72CR-17-2050] |
| V. | |
| STATE OF ARKANSAS | HONORABLE JOANNA TAYLOR, JUDGE |
| APPELLEE | AFFIRMED |

## MEREDITH B. SWITZER, Judge

In July 2017, Jeffrey Lewis was charged with negligent homicide while intoxicated, a Class B felony, in the Washington County Circuit Court. It was alleged that in March 2017, Lewis negligently caused the death of another person as a result of operating a motor vehicle while under the influence of methamphetamine and marijuana. Lewis, born on October 25, 1999, was seventeen at the time of the accident. He moved to transfer his case to the juvenile division of circuit court or, alternatively, to designate his case as an extended juvenile-jurisdiction proceeding. Consideration of Lewis's motion was continued on several occasions due to Lewis's undergoing a mental evaluation. Lewis was nineteen at the time of the hearing on his motion, which was held on November 8, 2018. The circuit court denied Lewis's motion by entry of an order on March 13, 2019. Lewis now appeals, arguing that the circuit court erred in denying his motion to transfer to juvenile court or,

alternatively, to designate his case as an extended juvenile-jurisdiction proceeding. We affirm.

Under Arkansas law, a prosecuting attorney has discretion to charge a juvenile sixteen years of age or older in the criminal division of circuit court if the juvenile has engaged in conduct that, if committed by an adult, would be a felony. Ark. Code Ann. § 9-27-318(c)(1) (Repl. 2015). On the motion of the court or any party, the court in which the criminal charges have been filed shall conduct a hearing to determine whether to transfer the case to another division of circuit court having jurisdiction. Ark. Code Ann. § 9-27-318(e).

## I. *Testimony*

At the hearing on the motion to transfer, Brooke Digby, a juvenile ombudsman whose job it is to advocate for youth committed to the Arkansas Department of Human Services Division of Youth Services (DYS), testified that DYS offers group therapy, family therapy, extensive psychological evaluations, and substance-abuse counseling; assists juveniles in obtaining their GEDs; and offers aftercare services until a juvenile's twenty-first birthday, which includes counseling and case-management services, as well as additional substance-abuse treatment, transportation, and help with job placement. Digby testified there is a unit dedicated to 18- to 21-year-olds.

Niki Rowland, a Madison County juvenile-probation officer, testified she supervised Lewis beginning when he was placed on probation at age 14 for delinquency charges for residential burglary and possession of a controlled substance. She testified Lewis has a history of family violence; he was exposed to domestic violence and drug use in the home; his

father was not in the picture when he was placed on probation; he lived with his grandmother and then moved in with his mother for a few months but left to live with his aunt and uncle due to domestic violence and drug use in his mother's house; and he was exposed to depression, violence, and drug use at his aunt and uncle's home. She said Lewis had a lot of school and behavioral issues, including failure to attend school regularly, that led to him being sent to boot camp. She further testified that Lewis did well with counseling when he was able to participate, but his family was not compliant, and he missed several appointments. Rowland opined that Lewis would benefit from continued services through DYS, including more consistent and intensive counseling and drug rehabilitation. Family in need of services (FINS) cases were opened on two occasions; Rowland said the family would do well for short periods of time but then things would "fall apart." Rowland said drugs were never an issue for Lewis when she was supervising him; he tested positive for THC one time while on probation. She testified that he did better when he was being provided services, and that other than boot camp, he never had any structure in his life. Rowland explained that Lewis's case was closed after two years of probation, the charges were dismissed, and he was not adjudicated delinquent. Rowland sought Lewis out after his mother overdosed on drugs; he hugged her and told her he was staying with friends because he did not want to stay at his grandmother's house because that was where his mother had died. Rowland said Lewis was always remorseful when he was in trouble, and he was never disrespectful to her.

State Trooper Eric Lee, one of the troopers who responded to the March 2017 fatality accident, which occurred shortly before 6 a.m. between Goshen and Fayetteville,

testified that when he arrived, three vehicles were blocking the road. A white Chevy pickup truck (driven by Lewis) was on the double yellow line facing west; a white Altima was blocking the westbound lane; and north of the vehicles was an overturned blue pickup in the north ditch. The driver of the blue pickup truck, Billy Kees, died at the scene. According to Trooper Lee, Lewis told him he was not sure what happened—he just looked up and saw headlights in his lane. Trooper Lee stated Lewis's demeanor was "a little bit odd," and he seemed "disassociated" from what was happening. Trooper Lee observed some indications that Lewis might be under the influence—one of his eyes was extremely wide open; his pupils were dilated, a sign of stimulant use; and he was fidgety and spoke quickly. Trooper Lee explained that while he would usually perform field-sobriety tests, such tests were not appropriate in this instance because Lewis complained of a leg injury and a possible head injury. Lewis was transported to Washington Regional Medical Center, where he agreed to having his blood drawn. Prior to the blood draw, Lewis told Trooper Lee he might have methamphetamine in his system because he had tried it the day before and thought it might show up in his blood. Although Lewis's statement indicated that Kees's truck had crossed into his lane and caused the accident, Trooper Lee testified that the physics and position of the vehicles made him doubt Lewis's version of events.

State trooper Ryan Leuer testified that he investigated the wreck. He said that gouge marks in the westbound left-hand lane indicated that the impact occurred in the lane heading toward Fayetteville; that it was a head-on collision in opposite directions, with the two trucks hitting driver side to driver side in the westbound lane; and Kees was deceased in the overturned truck.

4

Alexandra Barksdale, the driver of the Altima that was traveling behind Kees's blue truck heading toward Fayetteville, testified that "a white blur" hit the blue truck, flipping it into the ditch. She remembered seeing headlights, and then her car struck the truck with enough force to deploy her airbags. She said that when she was able to get out of her vehicle, she saw Lewis walk away from his truck, but he did not speak to her.

William Pope, a forensic toxicologist at the state crime lab, testified that Lewis's blood tested positive for methamphetamine and cannabinoids. He could not quantify the amount but could only say that the substances were present.

Dr. Victor Blair Huston, a psychologist at Ozark Guidance Center, testified that he performed a forensic evaluation on Lewis to determine his fitness to proceed. Huston diagnosed Lewis with posttraumatic stress disorder (PTSD) and methamphetamine and cannabis substance-abuse disorders, based on Lewis's self-reporting, with the substance-abuse disorders being in early remission. Huston explained that PTSD has five criteria: (1) experiencing traumatic events of some kind; (2) intrusion or reexperiencing symptoms such as unpleasant thoughts, memories, or nightmares of a past trauma; (3) trying to avoid things that remind them of the trauma; (4) negative aspects of emotional experience such as mistrust of other people, feelings of worthlessness, and difficulty having positive emotions; and (5) arousal symptoms such as tension, difficulty relaxing, irritability, reckless behavior, and sleep and concentration difficulties.

Huston opined that Lewis met all five criteria for a full diagnosis of PTSD. He explained that the traumatic events involved family-dynamic issues, including legal and drug issues for his parents, and caused a lot of chaos and instability. Lewis also suffered a seizure

5

at age 4 after hitting his head on a table, and he also hit his head on a fence at age 7 as a result of a bicycle accident. Huston reported that Lewis had an extensive mental-health-treatment history since the age of 7; he had been in outpatient facilities more than five times; medical records indicated attention-deficit-hyperactivity disorder as a child, as well as indications of oppositional-defiant disorder, depressive symptoms, and self-injurious behavior. Huston testified to positive drug tests for marijuana and benzodiazepines; Lewis had been prescribed clonidine to help him sleep and Abilify, an antipsychotic medication with mood-stabilizing properties, for behavioral issues. Lewis told Huston he did not do well at school and had behavioral issues, leading him to be placed in an alternative-learning environment; he dropped out of school at the beginning of twelfth grade and never obtained his GED. Lewis was the subject of several FINS petitions as a child due to his chaotic homelife. Lewis told Huston that he frequently moved between family members due to his mother's incarcerations; there was no consistent family support; his biological father was not in his life; he was physically abused by one of his mother's boyfriends; he also experienced sexually inappropriate behavior at around age 11 at the hands of an older relative and that relative's friend; he attempted suicide at age 8; and he was chronically suicidal after his mother died of a drug overdose in 2016. Huston explained that it is common to have substance-abuse issues with PTSD and that PTSD could interfere with normal maturity, making Lewis slower to "grow up," and possibly could interfere with impulse control. Huston explained that PTSD is treatable, but the problem is that people often do not remain in treatment, and while treatment does not cure the root problem, it does help with everyday functioning. Huston said Lewis missed the first two appointments set for his

6

evaluation but came to his third appointment. Huston found Lewis fit to proceed with no evidence of thought disorder, finding Lewis could organize his thinking and communicate effectively.

## II. *Standard of Review*

The circuit court denied Lewis's motion to transfer his case to juvenile court. In determining whether to transfer a case, Arkansas Code Annotated section 9-27-318(g) (Rep. 2015) requires the circuit court to consider the following factors:

(1) The seriousness of the alleged offense and whether the protection of society requires prosecution in the criminal division of circuit court;

(2) Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner;

(3) Whether the offense was against a person or property, with greater weight being given to offenses against persons, especially if personal injury resulted;

(4) The culpability of the juvenile, including the level of planning and participation in the alleged offense;

(5) The previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence;

(6) The sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult;

(7) Whether there are facilities or programs available to the judge of the juvenile division of circuit court that are likely to rehabilitate the juvenile before the expiration of the juvenile's twenty-first birthday;

(8) Whether the juvenile acted alone or was part of a group in the commission of the alleged offense;

(9) Written reports and other materials relating to the juvenile's mental, physical, educational, and social history; and

7

(10) Any other factors deemed relevant by the judge.

The circuit court shall make written findings on all the factors set forth in subsection (g) of this section. Ark. Code Ann. § 9-27-318(h)(1). However, the State is not required to introduce proof of each factor, and the circuit court does not have to give equal weight to each factor. *Flowers v. State*, 2017 Ark. App. 468, 528 S.W.3d 851. The movant bears the burden of proving the necessity of transfer from the criminal division to the juvenile division of circuit court. *Id.* On appeal, we will not reverse a circuit court's decision denying a motion to transfer unless it is clearly erroneous. *Id.* A finding is clearly erroneous when, after reviewing the evidence, the appellate court is left with a firm and definite conviction that a mistake was made. *Id.* The appellate courts will not reweigh the evidence presented to the circuit court. *Id.*

III. *Circuit Court Findings*

The circuit court made findings regarding each factor listed in section 9-27-318(g):

(1) The circuit court noted that Lewis was accused of "committing an extremely serious offense" in that he was alleged to have "negligently caused the death of another person as a result of operating a motor vehicle while under the influence of methamphetamines and marijuana." The circuit court found that society should be protected from this type of behavior, and "the evidence presented indicates that the disposition alternatives available in the juvenile division are not adequate to protect society."

(2) The circuit court found Lewis was alleged to have acted negligently.

(3) It was undisputed that the offense was against a person. The circuit court noted that, according to an eyewitness, Lewis crossed the center line and hit the driver's side of the deceased person's vehicle with the driver's side of his vehicle; it was also noted that Lewis's blood sample tested positive for methamphetamines and cannabinoids.

8

(4) The circuit court found Lewis "did not plan to cause the death of another person, but he voluntarily used methamphetamine and marijuana prior to voluntarily operating a motor vehicle."

(5) The circuit court found Lewis had never been adjudicated delinquent but had been charged as a delinquent for residential burglary and possession of a controlled substance at age 14. The delinquency petition was dismissed after Lewis completed two years' supervision through juvenile probation. Lewis was found on two occasions to be the subject of a FINS case and received counseling, school-based counseling, intensive family services, C-Step, and drug screens. Lewis did well in C-Step, excelling academically and completing his community service. Lewis tested positive for THC one time in two years while on probation.

(6) Lewis experienced "an extremely chaotic and unstable childhood." Lewis was sent to live with his maternal grandmother due to the violence between his parents, but his grandmother decided that she could only care for Lewis's sister, so he was returned to his mother's care. Violence between his mother and stepfather caused Lewis to go live with his aunt and uncle, but due to illicit drug use by his aunt and uncle, he was forced to move from that home. Lewis's mother overdosed at his grandmother's house when he was 17. Because his mother died in his grandmother's house, he declined to return to that house, and he went from house to house staying with friends. The circuit court noted that Lewis had attended multiple schools in his scholastic career. Nikki Rowland, the juvenile probation officer who supervised Lewis while the delinquency case was pending, testified that Lewis missed school due to family issues, and when he was in school he had behavioral issues. Rowland stated that while Lewis did well while he was in counseling, his guardians did not always comply with attendance or recommendations; she further stated that Lewis had never been disrespectful or aggressive to her.

(7) The circuit court found that Brooke Digby, the juvenile ombudsman, testified that DYS was a sentencing option in juvenile court, and 6 months of aftercare services were available to the family after release from DYS. The circuit court further noted that probation officer Rowland was of the opinion that Lewis could benefit from DYS and needed rehabilitation. However, the circuit court found, "[g]iven the age of the defendant, his nearly life-long history of traumatic events, and the extensive history of inpatient and outpatient counseling he has received . . . the Court finds it is unlikely the programs available to the juvenile division will rehabilitate the defendant prior to his 21st birthday."

(8) Lewis was alone in the commission of the alleged offense.

(9) The circuit court stated that it had studied, reviewed, and considered all of the documentary evidence admitted in the hearing, including Dr. V. Blair

9

Huston's Forensic Mental Health Examination Report: Fitness to Proceed, in which Dr. Huston opined Lewis met the criteria for Post-Traumatic Stress Disorder, as well as methamphetamine and cannabis use disorders, both of which were in early remission in a controlled environment. The circuit court noted that Dr. Huston testified that Lewis's traumatic events were related to "multiple chaotic and unstable events in childhood, and he had extensive counseling history, both inpatient and outpatient, beginning at age 7 years." Dr. Huston further testified that Lewis first attempted suicide at 8 years of age, and he was "chronically suicidal after his mother's death in 2016." Dr. Huston also testified that Lewis did not use methamphetamine until after his mother's death, it was common to have substance-abuse issues with a PTSD diagnosis, and trauma "could possibly cause delayed maturity."

(10) The circuit court noted all factors were considered and discussed in the preceding paragraphs.

IV. *Analysis*

Lewis contends that a review of the evidence against the ten statutory factors leaves a firm and definite conviction that a mistake was made in denying his motion to transfer his case to juvenile court. He agrees that negligent homicide while intoxicated, a Class B felony, is a serious offense. A juvenile may be tried as an adult solely because of the serious and violent nature of the offense. *C.B. v. State*, 2012 Ark. 220, 406 S.W.3d 796.

But Lewis argues it was not apparent that being prosecuted in the criminal division of circuit court would offer society any more protection from this type of behavior, asserting that sending him to the penitentiary would likely only harden him and increase his likelihood of recidivism. He further argues that the circuit court's finding that the disposition alternatives available in the juvenile division were not adequate to protect society was not supported by the evidence. He points out that Digby testified with regard to the numerous interventions and services available in the juvenile division, his former probation officer testified he would benefit from continued DYS services, and Huston testified that PTSD is treatable. He claims he made a series of mistakes culminating in a horrible accident,

10

but his PTSD diagnosis due to his traumatic childhood, and his use of drugs as a coping mechanism, are predictable difficulties following such a diagnosis. He argues that the circuit court's finding that the juvenile division lacked adequate options to protect society was not supported by the evidence in the record.

We cannot say that the circuit court's decision was clearly erroneous. The circuit court is not required to give equal weight to each factor, *Flowers*, *supra*, and it appears from the circuit court's findings that it gave significant consideration to the fact that Lewis had already been provided numerous treatments, services, and interventions during his life. Furthermore, Lewis will be 21 in October 2020, which means he would only have access to DYS services for less than one year. Lewis is requesting that this court reweigh the import and weight given by the circuit court to these factors, which we cannot do. *Clinkscale v. State*, 2018 Ark. App. 271, 550 S.W.3d 409.

Lewis admits that the offense was against a person, and Kees lost his life, which favors denial. Conversely, he points to the circuit court's findings that he was alleged to have acted negligently and did not plan to cause the death of another person, which weigh in favor of transfer to the juvenile division. Lewis argues that the circuit court's finding that he was intoxicated was "an inferential leap," and there is no evidence in the record to support that conclusion. We disagree.

Lewis faults Trooper Lee for not performing field-sobriety tests, but the testimony indicated such tests were not appropriate due to possible leg and head injuries suffered by Lewis as a result of the accident. Lewis further points out that while his blood was positive for methamphetamine and cannabinoids, the toxicologist could not testify as to how much

11

of each substance was present in his blood.  While this is true, this argument ignores the testimony from Trooper Lee regarding his observations about Lewis—dilated pupils, being fidgety, and quick speech—that indicated signs of stimulant use.

Lewis points out that he had successfully completed two years of probation at age 14 and that the charges against him were therefore dismissed.  He argues that his history showed that he responded well to the structure, services, and interventions available in the juvenile system when such services were imposed on him.  He also contends that his immaturity is due to the trauma he has experienced in his life and his PTSD.  The circuit court noted Lewis's "life-long history" of traumatic events, and the "extensive history" of inpatient and outpatient counseling Lewis had received, and it found that it was unlikely the juvenile programs would rehabilitate Lewis prior to his twenty-first birthday. We cannot say these findings were clearly erroneous.

While we agree there are factors that weighed in favor of Lewis's motion to transfer to juvenile court, there were also factors that weighed in favor of denying his motion to transfer.  The circuit court is not required to give equal weight to each factor, and we will not reweigh the evidence on appeal.  *Clinkscale*, *supra*.  As required, the court considered each factor and made findings on each factor, and we cannot say those findings were clearly erroneous.

Affirmed.

VIRDEN and BROWN, JJ., agree.

*Cullen & Co., PLLC*, by: *Tim Cullen*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Michael Zangari*, Ass't Att'y Gen., for appellee.